U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - ALEXANDRIA

DEC 3 0 2008

ROBERT H. SHEMWELL, CLERK
BY _____
         DEPUTY

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# ALEXANDRIA DIVISION

| | |
|---|---|
| RODNEY WASHINGTON | CIVIL ACTION NOS. 1:02-cv-0752 (LEAD), 1:04-cv-1969 (MEMBER), 1:07-cv-1192 (MEMBER) |
| -vs- | JUDGE DRELL |
| JOHN E. POTTER, POSTMASTER | MAGISTRATE JUDGE KIRK |

## R U L I N G

Before us now are two motions for summary judgment filed by Defendant in this matter, John Potter. Also before us is a motion to reconsider this Court's September 30th ruling denying Defendant's earlier-filed motion to dismiss several of Plaintiff's claims. The first motion for summary judgment (Doc. 41) pertains only to claims raised in the complaints in causes 02-0752 and 04-1969, whereas the second motion for summary judgment (Doc. 76) addresses only the claims raised in the complaint in cause 07-1192. The motion to dismiss (Doc. 40), treating several claims in causes 02-0752 and 04-1969 that were not addressed in the first motion for summary judgment, was denied (Doc. 71) and a motion to reconsider that ruling was filed on October 6, 2008. In an effort to clear up what has become a morass of discrimination, retaliation, and hostile work environment claims stemming from three lawsuits covering a calamitous ten years, we will analyze and dispose of these three motions together in this ruling.

## I.   Defendant's First Motion for Summary Judgment (Doc. 41)

The Defendant's first motion (Doc. 41) seeks partial summary judgment on claims of discrimination and claims of retaliation in each of Plaintiff's suits in cause 02-0752 and cause 04-1969.  While both causes are the subject of one motion, for purposes of clarity each suit is best treated separately because the factual bases of each are discrete occurrences, each spawning its own discrimination, retaliation, and hostile work environment claims.

Summary judgment on a party's motion "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).  If the movant produces evidence tending to show there is no genuine issue of material fact, the nonmovant must then direct the Court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 321–23 (1986)).  In the analysis, all inferences are drawn in the light most favorable to the nonmovant. *Herrera v. Millsap*, 862 F.2d 1157, 1159 (5th Cir. 1989).  However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient to defeat a motion for summary judgment. *Brock v. Chevron U.S.A., Inc.*, 976 F.2d 969, 970 (5th Cir. 1992).  Similar to conclusory allegations, "a mere scintilla [of evidence] is not

2

enough to defeat a motion for summary judgment." *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).

## A.  Plaintiff's First Complaint, Cause 02-0752

Mr. Rodney Washington, the Plaintiff, was employed with the United States Postal Service as a mail handler from October 1984 until September 1996 when an injury prompted his move to a less strenuous limited duty position, as outlined in his 2003 deposition.  This injury ultimately resulted in his filing an Equal Employment Opportunity Commission ("EEOC") claim.  By December 2006, a limited duty position that was within the Plaintiff's limitations was no longer available in the Alexandria Post Office.  His supervisor, Mr. Gene Cobb, allegedly attempted to notify the then-vacationing Plaintiff that submitting a full medical clearance form would be necessary before he could return to work again.  Mr. Cobb had two postal employees with whom Plaintiff was on friendly terms telephone Washington at his home, purportedly to save him a long trip into Alexandria, as he lived more than an hour away.  *See July 31, 2003 Depo. of Rodney Washington*, at 13; *see Unsworn Declaration of Gene Cobb*, at 2.[1]

Despite these efforts, apparently this matter was not communicated to the Plaintiff,[2] as Mr. Washington reported for duty in January 1997 without a return-to-work

---

1.   *See* 28 U.S.C. § 1746(2) (2006) (treating unsworn declarations).

2.   According to Mr. Washington's deposition testimony, his home was called early in the morning (while it is unclear, fellow employee James Richardson may have called anytime between 4:00 a.m. and 6:00 a.m., at which time Washington was not at home, and apparently left a message with a member of Washington's family) and later in the evening (sometime before or around 8:00 p.m. employee Angela Bates left a message on his answering machine).  He testified that the callers communicated only that Mr. Washington need not come into work the next *evening*—not a message not to return to work indefinitely—and that they mentioned nothing about a return-to-work certification.  *See July 31, 2003 Depo. of Rodney Washington* at 13–23.  However, an EEO complaint Mr.

3

certificate. Upon Plaintiff's request, Supervisor Cobb and postal employee/union steward Mr. Chris Bordelon met with Washington on January 8, 1997 to inform him that he could not return to work without a full medical clearance because there was no longer any light duty work available. Plaintiff lacked this documentation, and was made to complete a "leave" form, clock out, and go home that same day, January 8, 1997. Supervisor Cobb also informed Plaintiff that any documentation would have to be submitted to an administrative supervisor so as to prevent his circumventing Cobb's decision by going through a mid-level supervisor. Plaintiff maintains that the telephone calls, the denial of further limited duty, and the subsequent requirement to take leave and clock out amounted to retaliation in response to his prior EEO action and to discrimination based on his race. Next, Washington filed an EEO complaint in July 1997, and after having the various postal supervisors' decisions affirmed at the administrative level, filed the lawsuit in cause number 02-0752. The claims presently remaining for disposition in this action[3] are racial discrimination and retaliation, one of each stemming from (1) the December 1996 telephone calls, (2) his being made to clock out in January 1997, (3) the denial of light duty after January 1997, and (4) the denial of the right to

---

Washington wrote and filed in July 1997 indicates that he *did* speak with Mr. Richardson:

> The next time [Mr. Richardson] called, I answered the phone. I asked him what he was [doing] calling my house upsetting and harassing my family on Christmas. He told me that Mr. Cobb told him to tell me not to return back to work that night, because he was going to send me a form and I needed to have it filled out before I returned to work.

*See July 25, 1997 EEO Complaint of Discrim. in the Postal Service* at 2.

3.    A claim of disability discrimination under the Americans with Disabilities Act was conceded by the Plaintiff and accordingly dismissed by the Court. *See Ruling of Sept. 29, 2008 on Defendant's Motion to Dismiss* at 2 (Doc. 71).

return to work until June 2001; Plaintiff also alleges generally (5) the creation of a hostile work environment.[4] Defendant bases his motion for summary judgment only on the discrimination and retaliation claims arising from the first and second factual situations; the third and fourth form the bases of Defendant's motion to reconsider an earlier-filed motion to dismiss.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating or retaliating against an employee "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In a Title VII claim, the case proceeds according to the burden shifting regime articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "The initial two steps of this scheme are satisfied by production of evidence; one need not persuade to shift the burden to the other party." *Baker v. American Airlines, Inc.*, 430 F.3d 750, 754 (5th Cir. 2005) (age discrimination claim); *accord McCoy v. City of Shreveport*, 492 F.3d 551, 556–57 (5th Cir. 2007) (applying same analysis for racial discrimination and retaliation). Under the burden shifting analysis, a plaintiff relying solely upon circumstantial evidence must first establish a prima facie case of discrimination or retaliation to survive summary judgment. *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005). By establishing a prima facie case, the plaintiff raises a presumption of discrimination or retaliation, which the defendant must then rebut by producing evidence of a

---

4.  To clear up procedural confusion, it should be noted that Washington's hostile work environment claim in the first suit, 02-0752—administrative exhaustion of which was eventually conceded in Defendant's reply brief to Plaintiff's response in opposition to the original motion to *dismiss*—is not addressed in the *original* motion for summary judgment. It was raised in Defendant's *reply* to Plaintiff's response in opposition to the motion for summary judgment once Defendant realized its motion to dismiss was no longer the appropriate tool for dealing with the hostile work environment claim.

legitimate, nondiscriminatory or nonretaliatory reason for his actions. *Okoye v. Univ. of Tex. Houston Health Science Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001); *see also Reeves v. Sanderson Plumbing Prod.*, 530 U.S. 133, 142 (2000) ("[Defendant's] burden is one of production, not persuasion; it 'can involve no credibility assessment.'") (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). If the defendant meets his burden of production, then the presumption of discrimination or retaliation vanishes; the burden shifts once more. To survive summary judgment at this point, the plaintiff must prove by a preponderance of the evidence that the defendant's proffered reasons are but a pretext for discrimination or retaliation. *Okoye*, 245 F.3d at 512; *see also Reeves*, 530 U.S. at 143.

Under Title VII, a plaintiff can satisfy the requirements of a prima facie case for racial discrimination by showing that: (1) he is a member of a protected class, (2) he was qualified for the position, (3) he suffered adverse employment action, and (4) in the case of disparate treatment, others similarly situated were treated more favorably. *McCoy*, 492 F.3d at 556–57; *see also Abarca*, 404 F.3d at 941; *Okoye*, 245 F.3d 507, 512–13. He can establish a prima facie case of retaliation by showing that: (1) he participated in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action. *McCoy*, 492 F.3d at 557 (citing *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003)).

1.     The Telephone Calls

Here, Washington cannot establish that the receipt of the telephone calls on December 25, 2006 is prima facie evidence of either racial discrimination or retaliation. Assuming, *arguendo*, that Plaintiff satisfies the other elements of a discrimination claim, he has not established that these telephone calls constitute an adverse employment action under *McDonnell Douglas* and its progeny. Precedent from the Fifth Circuit teaches, at least in the discrimination context, that "[a]dverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *See, e.g., McCoy*, 492 F.3d at 559. Plaintiff has not shown that the telephone calls rise to this level. *See id.* (police officer whose badge and gun were retrieved by her supervisor and who was placed on paid leave was not subjected to an "adverse employment action" for purposes of her discrimination claim). There is no need to undertake the burden shifting analysis if a plaintiff fails to make out his prima facie case. Assuming that Plaintiff *had* made such a showing and had established his prima facie case of discrimination, the burden of production would shift to the Defendant, Potter. But here, Potter has produced evidence of a legitimate, non-discriminatory, purpose for ordering the two postal employees (with whom Plaintiff was on friendly terms both before and after the telephoning) to call Plaintiff at home: Gene Cobb, Washington's supervisor, testified that he simply wanted to save Plaintiff the hour-long trip to Alexandria and the hour-long trip home if Plaintiff had not yet completed his return-to-work certification of medical clearance. To the extent Plaintiff has not articulated evidence sufficient to meet his prima facie discrimination claim, summary judgment is proper on that claim.

Regarding Washington's retaliation claim for the same telephone calls, the United States Supreme Court has created an admittedly "general" objective standard because "the significance of any given act of retaliation will often depend on the particular circumstances. Context matters." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006). To rise to the level of actionable retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotations omitted). Plaintiff has not established that the telephone calls to his home constitute an adverse employment action under the *Burlington Northern* standard. Having coworkers telephone one's home for benign purposes is not atypical for employees, and it could certainly not be objectively construed as an act so significant as to deter a reasonable employee's filing of a Title VII claim. *See id.* (presenting hypothetical instances of retaliatory acts that rise to the level of objectively adverse employment actions). Even if the telephone calls were an adverse action, however, Plaintiff presented no evidence to rebut Defendant's proffered non-retaliatory, legitimate explanation of the telephone calls: to caution the Plaintiff against returning to work without the requisite medical clearance documentation. Summary judgment is therefore also appropriate on Plaintiff's claim that the telephone calls were actionably retaliatory.

2.   <u>Being Placed Off the Clock</u>

Plaintiff's complaint also raises claims for racial discrimination and retaliation stemming from: (1) his being made to clock out and go home on his first week back from

vacation, on January 8, 1997, (2) his supervisors' failure to provide limited duty after December 1996, and (3) his not being allowed to return to work after that point.[5] Under the *McDonnell Douglas* framework, Washington is clearly a member of a protected class. Defendant asserts that Plaintiff has failed to show that he was qualified for the position. It is uncontested that Washington worked as an employee of the Postal Service from 1984 until 1996 in one capacity or another and was arguably qualified to do so. However, after his injury in September 1996, he was limited in his physical ability to work and was only qualified for the limited duty "make work" position he held until December 1996. In the parallel context of age discrimination (also subjected to the *McDonnell Douglas* analysis), the Fifth Circuit requires a plaintiff to "prove that he performed his job to the standards of his employer" to make out his prima facie case. *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 350 (5th Cir. 2007). Specifically: "[A] plaintiff challenging his termination or demotion . . . can ordinarily establish a prima facie case of age discrimination by showing that *he continued to possess the necessary qualifications for his job at the time of the adverse action* . . . . By this we mean that plaintiff had not suffered physical disability or loss of a necessary professional license or some other occurrence that rendered him unfit for *the position for which he was hired*." *Id.* at 1506 & n.3 (emphases added) (quoting *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503 (5th Cir. 1988)). In Washington's case there is evidence that the limited duty work had dried up, and, as the Plaintiff was not qualified for full duty work at that time, he was no

---

5.    The latter two claims are treated more fully in the section urging this Court to reconsider its Ruling on Defendant's earlier-filed motion to dismiss these claims for failure to exhaust administratively.

longer fit for the position for which he was hired. There is no evidence that Plaintiff was initially hired in 1984 to work limited duty nor to be in a "make work" status forever. As such, Plaintiff cannot make out a prima facie case that he was qualified so as to shift the burden under the *McDonnell Douglas* inquiry. Washington also has a difficult time establishing that being made to clock out was an adverse employment action. In the discrimination context, only "ultimate" decisions are subjected to an adverse or non-adverse analysis. *McCoy*, 492 F.3d at 559. Plaintiff was not terminated from his position; rather, he was sent home until he completed return-to-work documentation on his medical issues. *See id.* (police officer whose badge and gun were retrieved by her supervisor and who was placed on paid leave was not the subject of an "adverse employment action" for purposes of her discrimination claim). Because Plaintiff cannot satisfy the prima facie requirement of his continued qualifications for employment, nor can he prove that he suffered an adverse employment action, summary judgment is appropriate for the discrimination claims arising out of his being made to clock out on January 8, 1997.

Plaintiff also complains that his being made to clock out was retaliation for prior Title VII-protected EEO activity on his part in 1996. Defendant concedes, or at least presupposes, that being placed off the clock can be prima facie evidence of an adverse employment action in his motion for summary judgment (Doc. 41, at 9); however, the Postal Service here argues the non-adversity of its action.[6] Under the objective standard for actionable retaliation set forth in *Burlington Northern*, "a plaintiff must show that a

---

6. Because the Plaintiff understands this element to be contested by his treatment of it in his responsive motion, we discuss it here. (Doc. 55, at 5–6.)

*reasonable* employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68–69 (2006) (quotations omitted, emphasis added) (noting that "the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint"). In *Burlington Northern* the Supreme Court found it reasonable to conclude that the plaintiff employee could have been dissuaded from pursuing a Title VII claim when that employee was suspended for 37 days without pay and given no indication of when or whether she could return to work at all. *Id.* at 72–73. Mr. Washington's case turns on his being sent home only until he turned in the requisite paperwork to return to work. He controlled his own destiny. He has not presented prima facie evidence here that being made to clock out was, in this context, materially adverse.

Defendant also challenges Washington's argument for a causal connection between his protected act and Defendant's allegedly retaliatory act. Potter urges that there exists a substantial enough lapse in time between the 1996 EEO claims and Plaintiff's being placed off the clock in January 1997 to create a presumption that any action was non-retaliatory. However, the citations by Defendant refer to factual situations with intervals of two to five years, twenty months, and ten months, respectively, between EEO claims and adverse employment actions. *See Bouie v. Equistar Chems.*, 188 Fed. App'x 233, 238 (5th Cir. 2006) (collecting cases); *see also Patton v. Schlumberger Tech. Corp.*, 95 F.3d 1148 (5th Cir. 1996) (discussing intervals).

Evidence here, rather, indicates that Plaintiff, who had worked with the Postal Service since 1984, filed an EEO claim in late September 1996 and was placed off the clock on January 8, 1997, an interval of hardly four months from the most recent EEO activity. We cannot say that this is a sufficiently lengthy interval to negate the causal connection. Yet the fact remains that Plaintiff has not presented any other evidence that the "but-for" cause of his being placed off the clock in January 1997 was his pursuit of an EEO claim in September of 1996. Even assuming that Washington met his burden of producing prima facie evidence of retaliation, he has adduced no evidence to rebut Defendant's proof that Plaintiff could have returned to work with a return-to-work certificate. Plaintiff having failed in this, summary judgment for Potter is proper against Plaintiff's claims that his being placed off the clock amounted to actionable retaliation by the Defendant.

3.    Hostile Work Environment

Potter addressed Washington's hostile work environment claim in his reply brief to Plaintiff's memorandum opposing the motion for summary judgment. Before we could grant Defendant's motion for summary judgment on a hostile work environment claim, Washington must have produced evidence establishing that (1) he is a member of a protected class; (2) he was subject to unwelcome harassment; (3) the harassment affected a term or condition of his employment; and (5) that the Defendant knew or should have known about the harassment and failed to take prompt remedial action. See *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 347–48 (5th Cir. 2007) (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 310 (5th Cir. 1996)). We examine the Plaintiff's claim under "a totality-of-the-circumstances test that focuses on 'the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating . . . and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Walker v. Thompson,* 214 F.3d 615, 625 (5th Cir. 2000)). "Although '[d]iscriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive' to support evidence of a Title VII violation, 'simple teasing, offhand comments, and isolated incidents, (unless extremely serious) will not amount to discriminatory charges' that can survive summary judgment." *Id.* (citations omitted). In the present jurisprudential scenario, Washington could rely upon the "isolated incidents" of the coworkers' telephone calls as grounds for a hostile work environment claim only if something "extremely serious" had taken place. There is nothing pervasively or even remotely discriminatory about the calls. As mentioned above, Washington's testimony indicates that he was on a friendly basis with both callers before and after the telephone incidents occurred. Therefore, because Plaintiff has not produced evidence sufficient for a reasonable jury to find that a hostile work environment existed, summary judgment in favor of Defendant is also appropriate on this claim.

      4.   <u>Conclusion</u>

Because the foregoing rulings on Defendant's motion for summary judgment dispose of the claims of a hostile work environment, discrimination and retaliation stemming from (1) the 1996 telephone calls and (2) Plaintiff's being made to clock out in January 1997, the only remaining claims in cause number 02-0752 are claims for discrimination and retaliation based on (3) a denial of light duty after Plaintiff's being made to clock out in 1997 and (4) a denial of the right to return to work which lasted until

June 2001. As discussed at length hereinbelow, Defendant is correct in claiming that the light duty and return-to-work claims were not properly presented or exhausted at the administrative level, and they are both discussed and disposed of in our reconsideration of the motion to dismiss in Part IV of this Ruling. Because there are no remaining claims in cause 02-0752, this suit will be dismissed with prejudice.

## B. Plaintiff's Second Complaint, Cause 04-1969

According to the Statement of Uncontested Facts accompanying Potter's motion for summary judgment, after being sent home in 1997, Washington did not work for the Postal Service until 2001. On June 1, 2001, he received a letter from the post office branch in Alexandria informing him that a limited duty position was once again available for him. He returned to work there a few days later at a clerical position, being assigned a night shift position with weekly off-days of Sunday and Tuesday. However, starting from the time he returned in June Washington unilaterally employed Postal Service Form 3189—permitting schedule changes for personal convenience—to alter his schedule each week to have Saturday and Sunday off, substituting Saturday for Tuesday.

On Thursday, September 13, 2001, Mr. Washington submitted two Form 3189s to his immediate supervisor Karen Butler, who in turn submitted them to Connie Hayes, the Acting Manager of Distribution Operations, for approval. Apparently Mrs. Hayes had newly instituted a general procedure whereby all Form 3189s would be forwarded to her by lower-level supervisors prior to approval or disapproval so she could have a better managerial understanding of the facility's operations. *See Unsworn Declaration of Connie Hayes*, at 2. The first Form covering the week of September 8–14 was approved

by Mrs. Hayes that same date, September 13, as Washington had *already* taken off the weekend of September 8–9. She did not, however, approve the second Form covering the two weeks of September 15–28. While some date/weekday specifics are hazy in the record, the basic scenario is clear: After the second schedule change request was denied on September 13 Washington did not appear for his scheduled Saturday, September 15, shift (which began on Friday, September 14 since he worked night shift). Instead he appeared for work on the Monday, September 17, shift (which began on Sunday, September 16 since he worked night shift) and was paid at the overtime 150% rate as if the schedule change had been granted. On October 2 Plaintiff was issued a Notice of Seven Day Suspension after being charged with "Unsatisfactory Attendance, i.e. AWOL." *See generally Statement of Uncontested Facts.*

Also, Washington now complains of discrimination for disparate pay beginning when he returned to work in that another limited duty employee, a white male performing the same clerical work of answering telephones, was paid at a Level 5 while Washington received only Level 4 pay. *See Plaintiff's Original Complaint.* He timely initiated an EEOC complaint in which these three actions formed the basis for claims of racial discrimination and retaliation. After a hearing, the final agency decision by the Postal Service in 2002 found no prima facie establishment of racial discrimination or retaliation; this decision was affirmed after an appeal to the Office of Federal Operations in 2004. *Id.* Plaintiff then timely filed suit 04-1969 in this Court.

As noted above, in a Title VII claim the analysis of a case consisting entirely of circumstantial evidence also proceeds according to the burden shifting regime of

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under Title VII, a plaintiff can satisfy the requirements of a prima facie case for racial discrimination by showing that: (1) he is a member of a protected class, (2) he was qualified for the position, (3) he suffered adverse employment action, and (4) in the case of disparate treatment, others similarly situated were treated more favorably. *McCoy*, 492 F.3d at 556–57; *see also Abarca*, 404 F.3d at 941; *Okoye*, 245 F.3d 507, 512–13. He can establish a prima facie case of retaliation by showing that: (1) he participated in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action. *McCoy*, 492 F.3d at 557 (citing *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003)).

### 1. The AWOL Charge

Washington claims that his absent without leave penalty was the result of racial discrimination and retaliation for earlier protected activity. With regard to discrimination, Defendant Potter concedes that Plaintiff is a member of a protected class and that he suffered an adverse employment action by Defendant. Acknowledging that concession, we analyze whether Plaintiff has presented prima facie evidence that "similarly situated employees outside the protected class were treated more favorably." *Wheeler v. BL Dev. Co.*, 415 F.3d 399, 405 (5th Cir. 2005). Defendant argues that Washington produced no evidence of similarly situated employees treated differently. Washington, on the other hand, responds by adverting to portions of the administrative hearing transcript and letters of discipline, relating three examples of employees of

another race who faced AWOL charges as well. Plaintiff charges that his being determined as AWOL was discriminatory. However, the record evidence is that these three employees of another race were also charged with being AWOL when they had been absent without leave. Section 666.82 of the United States Postal Service's *Employee and Labor Relations Manual* as quoted in the letter charging Plaintiff with being AWOL is clear that "[e]mployees failing to report for duty on scheduled days including Saturdays, Sundays and Holidays will be considered absent without leave except in actual emergencies which prevent obtaining permission in advance." *See Notice of 7-Day Suspension* at 2. It could be that Plaintiff would carry his burden had he produced evidence of an employee of majority race who was absent without leave but was *not* charged with being AWOL. He did not.

Additionally, in that Plaintiff has alleged that his AWOL charge was retaliatory in response to his earlier EEO activity, he would also have been required to make a showing that a causal connection existed between the protected activity and the adverse employment action: being charged with AWOL. *See McCoy*, 492 F.3d at 556–57. Washington has alleged that Connie Hayes, who, in denying his Form 3189, told him something to the effect that he would never get another schedule change while she was the manager. Mrs. Hayes' unsworn declaration contains a statement to the effect that Washington was therefore "expected to work his regular work schedule" (presumably without any more schedule changes allowed). In the summary judgment context, the he-said-she-said evidentiary tie would go to non-movant Plaintiff. Yet Washington has still made no showing sufficient to establish a causal nexus between the AWOL charge

and his earlier EEO activity, even if we assumed that he has met his prima facie burden so as to shift the burden to Defendant. He produced no evidence of pretext to surmount Defendant's non-retaliatory explanation that, simply, Washington was charged with being absent without leave because he was absent without leave under postal employment regulations. Summary judgment is accordingly proper on Plaintiff's claim that being charged with AWOL was racially discriminatory or retaliatory.

### 2. The Seven-Day Suspension

This portion of the claims is an adjunct to the former. Washington claims that receiving a *seven-day* suspension for his AWOL was a particularly harsh punishment typically not imposed upon violators. He asserts that this draconian suspension was also a product of racial discrimination and retaliation for his same, earlier, EEOC claims against the Postal Service. Defendant Potter again concedes that the Plaintiff belongs to a protected class and suffered an adverse employment action in being suspended, and for purposes of argument concedes that Plaintiff was otherwise qualified for his position. Still, Potter continues to challenge the existence of evidence that Plaintiff was treated less favorably than similarly situated employees of another race. In his response to the motion for summary judgment on this point, Washington refers to three postal employees whose situations are discussed in the administrative adjudication of these claims before the EEOC in September 2003 (and also vaguely referenced in Plaintiff's discovery responses). *See Final Agency Decision of Geraldine H. Page, Administrative Judge* at 6 ("Exh. B-8" in Defendant's first motion for summary judgment). It is unclear the extent to which Plaintiff considers the administrative law judge's factual findings to be

"factual" for this proceeding. We think it safe to assume that they are true and correct enough for our purposes. We are not, however, limited by the ALJ's legal conclusions. The relevant portion of the ALJ's bench opinion brought to our attention by Washington provides:

> The complainant [Plaintiff] contends that the agency [Defendant] treated others more favorably who were charged with AWOL in that they were given either a suspension with no time loss or letters of warnings. For example, [J.B.] (PTF Mailhandler) was charged on November 1, 2002 with being AWOL for several days for a total of 40.2 hours. He was notified that he would be suspended for seven days, but he would remain on duty during the term of the suspension with no loss in pay. CE 1. Lonnie Cater, Supervisor Distribution Operations, signed the notice. On June 28, 2001, [S.L.] (Mailhandler) was issued a letter of warning for being AWOL for 4.75 hours by James Berry, Supervisor, Customer Services; [A.C.] (PTF Clerk) was issued a letter of warning on February 6, 2001 for being AWOL for 39.73 hours by Abel Garza, Supervisor, Customer Services (Acting). CE 2 and CE 3. The agency maintains that these employees are not similarly situated to the complainant. We presume that they were of a different color/race than the complainant.

*Id.* (disciplined employees' names redacted for privacy). Ultimately the ALJ distinguished each comparator from Washington and found "that complainant is not similarly situated to the comparators, and he has not shown circumstances from which an inference arises of discrimination." *Id.* at 7. The ALJ illustrated these distinguishing factors on page seven of her ruling against Plaintiff, but the factual situation as related above is sufficient for our inquiry.

In summary, Plaintiff points to three non-black employees who were punished less harshly upon being determined to have been AWOL. To make a proper comparison, we see that A.C., a "PTF Clerk," was given a Letter of Warning by Abel Garza, Jr., Acting Supervisor, Customer Services, on February 6, 2001 after "unscheduled absences" of

varying durations from one hour to one day of unscheduled sick or annual leave and two instances of being AWOL totaling 2.59 hours. A.C. had complained of an "incurable disease of the lower intestine," but provided no supporting medical documentation. The A.C. warning letter appears to distinguish an unscheduled absence (calling in sick) from AWOL (simply leaving or not showing up), regarding the latter as more serious. *See A.C. Letter of Discipline*, together with all comparators' letters, at Doc. 56-4. J.B., a "PTF Mail Handler," was suspended for seven days in a November 1, 2002 letter signed by Lonnie Cater, Supervisor Distribution Operations, but would remain on duty with no lost pay after several unscheduled absences of varying durations (16, 18, and 11 hours of unscheduled sick leave) and three instances of being AWOL totaling 15.02 hours. J.B. explained in his defense that he had taken some cold medicine and slept until the next day (although it is unclear whether he was responding to one incident in particular or for missing on each occasion). *See J.B. Letter of Discipline*.[7] Lastly, S.L., a full time "Mail Handler," was issued a Letter of Warning signed by James B. Berry, Supervisor, Customer Service, on June 28, 2001 for 4.75 hours of AWOL. S.L. apparently was cited for leaving his shift early after incompletely filling out a sick leave form he placed on an absent supervisor's desk in which he noted he was "leaving from dur[e]ss" after an apparently heated meeting at the Post Office. *See S.L. Letter of Discipline*.

We must inquire whether these factual comparisons as presented by Plaintiff amount to prima facie evidence that "similarly situated employees outside the protected

---

7.  Evidence elsewhere in the record suggests that J.B. had an alcohol problem for which he was seeking treatment and about which his supervisors were well-informed. *See Transcript of May 14, 2003 Hearing before Geraldine H. Page, Administrative Judge*, at 38–39 (testimony of Connie Hayes).

class were treated more favorably." *Wheeler v. BL Dev. Co.*, 415 F.3d 399, 405 (5th Cir. 2005). "To establish disparate treatment, a plaintiff must demonstrate that a 'similarly situated' employee under 'nearly identical' circumstances, was treated differently." *Id.* "[S]imilarly situated means employees with the same position, qualifications, and pay rate." *Ortiz v. Shaw Group, Inc.*, 250 Fed. App'x 603, 606 (5th Cir. 2007) (citing *Shackelford v. Deloitte & Touche, L.L.P.*, 190 F.3d 398, 405–06 (5th Cir. 1999)). "When a supervisor of one race treats employees of the same race more favorably than similarly situated employees of another race under circumstances that are essentially identical, a presumption of discriminatory intent is raised." *Barnes v. Yellow Freight Sys., Inc.*, 778 F.2d 1096, 1101 (5th Cir. 1985). "Or put another way, the conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001). "[T]he issue is whether [the plaintiff] and his alleged comparator employees were similarly situated from the perspective of their employer at the time of the relevant employment decisions." *Perez v. Tex. Dep't of Crim. Justice*, 395 F.3d 206, 210 (5th Cir. 2004).

As Plaintiff has provided no evidence of what these employees actually do, we take a more facile approach to determine similarity. None of these three employees have the same job title as Washington, whose letter of discipline identifies his as a "Tour 1—Modified Clerk." A.C. was a part-time flex *clerk*, arguably similar enough; yet J.B. was a part-time flex mail handler and S.L. a full-time mail handler. It is reasonable that a clerk's being AWOL could be more serious to the postal service than a mail handler's

being AWOL, or vice versa. But if A.C. is the most similarly situated employee, the record notes that he was only AWOL for a few brief periods, seemingly less serious than being AWOL for an entire shift. Only J.B. was AWOL more frequently (three occasions) and for a longer total duration (15.02 hours) than Washington (only one full shift, presumably 8 hours, AWOL), but as noted above, J.B. was a mail handler and not a limited duty clerk. Each position has a separately negotiated contract, permitting different punishments; this fact explains why J.B. did not lose pay during his suspension but Plaintiff did. *See Transcript of May 14, 2003 Hearing before Geraldine H. Page, Administrative Judge*, at 38–39 (testimony of Mrs. Connie Hayes). Thus both the A.C. and J.B. cases are dead-ends for the similarly-situated analysis. Finally, J.B., like Washington, also received a seven-day suspension.

Additionally, each of these three white employees were disciplined by a supervisor other than Plaintiff's white disciplining supervisor, Mrs. Connie Hayes. This difference negates one of the helpful laboratory control tests—similarity of supervisor—for our inquiry into what may have caused disparate punishments. If all were punished differently, but by the same supervisor, that would be an additional relevant factor assisting in a comparison of the employees. *See Barnes v. Yellow Freight Sys., Inc.*, 778 F.2d 1096, 1101 (5th Cir. 1985) ("When **a** supervisor of one race treats employees of the same race more favorably than similarly situated employees of another race under circumstances that are essentially identical, a presumption of discriminatory intent is raised.") (emphasis added). Plaintiff has provided no evidence of the other supervisors' race or color and thus the proof of successful comparison is simply absent.

Perhaps most importantly, none of these three employees' disciplinary letters indicates that they were intentionally AWOL on dates they had requested off for personal convenience, but which requests had been expressly denied. Compare the treatment of a noncompliant employee for purposes of a similarly-situated inquiry in *Nieto v. L&H Packing Co.*, 108 F.3d 621, 623 (5th Cir. 1997), where the Fifth Circuit provides:

> "The summary judgment evidence does not support [Hispanic plaintiff] Nieto's contention that he and [comparator non-Hispanic employee] Caillouet were similarly-situated employees. First, it is undisputed that two different supervisory employees told Nieto to put an 'inedible' label on the contaminated meat and that he did not do so. In contrast, it is undisputed that Caillouet *did not disobey a direct instruction from his supervisor*. . . . Under these circumstances, [the supervisor's] decisions to provide Caillouet with a written warning and to terminate Nieto do not raise a material question of fact that Nieto's termination was motivated by discriminatory animus."

*Id.* (emphasis added). Considering the differences of kind and degree among all of the AWOL employees' positions, attendance infractions and the surrounding circumstances and the limited evidence Plaintiff has produced, there remains no "control group," i.e., even one similarly situated employee in nearly identical circumstances, against which to measure the disparate results. Lacking a control group, it is impossible to infer from Washington's evidence that his race, and not "the difference between the plaintiff's conduct and that of those alleged to be similarly situated[,] accounts for the difference in treatment received from the employer." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001). Because Washington has failed to produce prima facie evidence of racial discrimination, summary judgment is appropriate on his claim that the seven-day suspension was racially discriminatory in its imposition.

23

Washington also claims that the suspension was retaliatory for his having engaged in prior EEO complaints against various postal service employees. Potter concedes elements one and two, that Plaintiff engaged in several instances of a protected activity in filing EEO claims, and that he faced an adverse employment action. He disputes, however, the but-for causal nexus and argues that Plaintiff has produced no prima facie evidence to support such a nexus. Plaintiff here advances his claim of Connie Hayes' alleged statement to the effect that he would never get another schedule change so long as she was Manager of Distribution Operations. Keeping in mind that Washington is the non-movant on summary judgment, even if we assume that she said this, it remains unclear how the Plaintiff's personally felt conclusion—that she said this because of a retaliatory animus—can rise to the level of prima facie evidence. Besides, the Defendant proposes a non-retaliatory explanation that Washington was suspended for being AWOL after a schedule change was denied.

The Fifth Circuit "has consistently held that in retaliation cases where the defendant has proffered a nondiscriminatory purpose for the adverse employment action the plaintiff has the burden of proving that 'but for' the discriminatory purpose he would not have been terminated." *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005) (quotations omitted) (rejecting the less stringent "motivating factor" test). Washington has not argued particulars in this regard, but rather concludes that "a connection is clear when reviewing the history and in this instance spanned Washington's entire postal service career" and that the "nexus between his complaints and furthermore the success of his complaints and the adverse actions are clearly

established in the record, Washington's deposition and the hearing transcript." (*Memorandum in Opposition to Motion for Summary Judgment*, Doc. 55-1, at 10–11.) Without more precise evidence, such a connection or nexus does not follow from the face of these documents. As Potter explains, the seriousness of being AWOL for an entire shift in light of the circumstances is complete justification for the decision to suspend Plaintiff for seven days. Yet even if we construed all these documents that purport to contain the necessary nexus in Plaintiff's favor and found a "nexus," he still has not shown that he would not have been terminated *but for* his EEOC activity. *See Septimus*, 399 F.3d at 608 ("[T]he employee's ultimate burden is to prove that the employer's stated reason for the adverse action was merely a pretext for the real, retaliatory purpose. The proper standard of proof on the causation element of a Title VII retaliation claim is that the adverse employment action taken against the plaintiff would not have occurred 'but for' [his] protected conduct."). In Washington's case, other valid reasons exist for the imposition of the suspension. These reasons are not rebutted by Plaintiff. Summary judgment is thus also appropriate on the claim that the seven-day suspension was imposed in retaliation for prior EEOC activity.

       3.   <u>Claim of Disparate Pay</u>

Washington also claims that when he was sent home in January 1997 he was paid at a Postal Service Level 5, and upon returning to work in June 2001 in a limited duty clerical capacity was only paid at Level 4. It is uncontested that G.S., another limited duty employee performing the same telephone-answering duties as Plaintiff, was paid at Level 5. As noted elsewhere, Washington is a member of a protected class. "To

establish a *prima facie* case of discriminatory pay a plaintiff must prove, '(1) that [])he is a member of a protected class, and (2) that [])he is paid less than a nonmember for work requiring substantially the same responsibility.'" *Tillman v. S. Wood Preserving of Hattiesburg, Inc.*, 250 Fed. App'x 622, 625 (5th Cir. 2007) (quoting *Uviedo v. Steves Sash & Door Co.*, 738 F.2d 1425, 1431 (5th Cir. 1984)). Plaintiff has arguably satisfied his prima facie burden under the *McDonnell Douglas* standard in that he performed the same clerical functions as an employee outside the protected class and yet received lower pay in this instance. This fact was conceded by management, Supervisor Connie Hayes, at the administrative hearing on this matter. *Transcript of May 14, 2003 Hearing before Geraldine H. Page, Administrative Judge*, at 41, 85. By establishing a prima facie case, Plaintiff raises a presumption of discrimination or retaliation, which Defendant must then rebut by producing evidence of a legitimate, nondiscriminatory reason for his actions. *Okoye v. Univ. of Tex. Houston Health Science Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001); *see also Reeves v. Sanderson Plumbing Prod.*, 530 U.S. 133, 142 (2000) ("[Defendant's] burden is one of production, not persuasion; it 'can involve no credibility assessment.'").

Defendant's explanation is that Washington left work not at Level 5 but only at Level 4 in January 1997 and was consequently returned to that same level in June 2001. At the administrative hearing, Plaintiff's one-time supervisor Mrs. Hayes gave uncontested testimony that if Washington left at one pay level and was later reinstated, he should have returned at that same pay level. He produced no evidence that he was paid at a Level 5 prior to his reinstatement other than two references from the 2004 administrative hearing to a pay stub made out to him purportedly reflecting his pay

grade as Level 5.  (Plaintiff has not produced the actual pay stub and so we quote both references in full below.)  The first reference was during the hearing itself, when Mrs. Hayes was questioned by Plaintiff's counsel as follows:

> Q.   That's a pay stub of Rodney Washington, correct?
> A.   Yes, it is.
> Q.   Okay.  And if you look to the far left that shows his pay grade is five, is that correct?
> A.   That's correct.
> Q.   Okay.  That would have been in pay of 1 of '97, correct?
> A.   Right.  Pay period 1 of 1997.
> Q.   Okay.  And if that had been—if he had gone out around that time with pay grade five, he should have come back at pay grade five, correct?
> A.   If he went out at pay grade five, he should have come back at pay grade five.

*Transcript of May 14, 2003 Hearing before Geraldine H. Page, Administrative Judge,* at 90–91 (testimony of Mrs. Connie Hayes).  The other reference to this pay stub occurs in the ALJ's final decision after the hearing:

> The complainant [Plaintiff], a Level 4 employee, was performing the same duties as [G.S.] (White), a level 5 employee.  The agency explained that the complainant and [G.S.] were both limited duty employees who had modified job assignments . . . ; therefore, they maintained the same job level that they had before their limited duty assignments.  The complainant countered that one pay document in the IF shows that he was a Level 5 at one time, after being assigned to Level 5 work when he could no longer perform Level 4 duties.

*Final Agency Decision of Geraldine H. Page, Administrative Judge* at 9 ("Exh. B-8" in Defendant's first motion for summary judgment) (employee name redacted).  Defendant has responded with a series of payment records for Plaintiff and an unsworn declaration of Mr. Kenneth Maher, the Labor Relations Specialist for the Defendant Postal Service's Louisiana Division since September 2003.  Mr. Maher reviewed the pay documents from

Defendant's fortnightly pay periods from the last period in fiscal year 1996 through the first four periods of fiscal year 1997, describing Plaintiff's work activities for each week of each two-week work period. The pay periods reflect that Plaintiff was paid for most work at a Level 4 and intermittently paid at a Level 5. Mr. Maher concluded:

> Payroll records that I reviewed for pay periods 26-FY1996, 1-FY1997, 2-FY1997, 3-FY1997, and 4-FY1997 all reveal that Rodney Washington was in a Level 4 pay status from December 1996 through 1997. Although there were occasions when he worked a different assignment within the clerk craft and received Level 5 pay for those hours, the payroll records clearly indicate that his base salary was Level 4, Step 0 (LVL-STP 04-0).

*Unsworn Declaration of Kenneth Maher*, at 1–2. Additionally, whenever Plaintiff was paid for annual or sick leave he was paid at Level 4. The instances when he was paid at Level 5 are, according to Mr. Maher, only when Plaintiff performed intermittent "higher level work." *Id.* at 2.

Defendant has therefore articulated a legitimate, nondiscriminatory, reason and produced evidence supporting it in the form of payroll records. Thus, the burden shifts once more. To survive summary judgment at this point Washington must prove by a preponderance of the evidence that Defendant's proffered reasons are but a pretext for discrimination. *Okoye*, 245 F.3d at 512. Plaintiff has produced no evidence, probative or not, that some racially discriminatory animus motivated Defendant's policy of paying reinstated employees at the base level of pay they formerly received, in Plaintiff's case Level 4. Because Plaintiff is unable to meet his burden under the *McDonnell Douglas* standard, summary judgment is proper on his claim of disparate pay.

4.    Conclusion

Because Defendant's motion for summary judgment has disposed of all claims of discrimination and retaliation stemming from (1) the September 2001 AWOL charge and (2) the seven-day suspension for being AWOL, as well as (3) the claim for discriminatory compensation stemming from Washington's being paid at Level 4 for the same work as a coworker paid at Level 5, there are no remaining claims in cause 04-1969, and it is dismissed with prejudice.

## II.  Defendant's Motion for Reconsideration of the Court's Ruling Denying Defendant's Motion to Dismiss (Doc. 72)

In the midst of challenges that certain of Plaintiff's claims were not properly within our jurisdiction[8] and subsequent concessions and bipartisan agreements that some were while others were not, we incorrectly disposed of portions of Defendant's earlier-filed motion to dismiss. (*See* Motion to Dismiss for Lack of Jurisdiction, Doc. 40; Ruling Denying Motion to Dismiss, Doc. 71.) Specifically, Defendant urges us to dismiss Washington's claims of discrimination and retaliation arising the events of his being denied light duty after being made to clock out in 1997 and the right to return to work until June 2001.

Washington's original EEO claim was accepted for investigation as follows: "You were harassed by Supervisor Cobb when he had two employees call your home on December 25, 1996, and upon your return to duty on January 8, 1997, you were placed off the clock." *See* Charge Letter from Otis Maclin, Jr. to Rodney Washington, Nov. 25,

---

8.  *But see Pacheco v. Mineta*, 448 F.3d 783, 788 n.7 (5th Cir. 2006) ("There is disagreement in this circuit on whether a Title-VII prerequisite, such as exhaustion, is merely a prerequisite to suit, and thus subject to waiver and estoppel, or whether it is a requirement that implicates subject matter jurisdiction.").

1997 ("Exh. B-3" in Defendant's original motion to dismiss). The Postal Service's final decision on the matter framed the issues in the exact same language and is limited in scope succinctly to those two issues. *See* Decision Letter from Robert E. Walters to Rodney Washington, Dec. 16, 1998 ("Exh. B-5" in Defendant's original motion to dismiss). Defendant claims that Plaintiff failed to present the denial of light duty and the denial of the right to return to work explicitly to the EEO investigation at the agency level, and therefore these allegations were not exhausted administratively. Washington accuses Defendant of "attempting to split hairs" by excluding the "surrounding events" of Plaintiff's other allegations for being made to clock out.

The Fifth Circuit provides valuable guidance on this matter:

> Courts should not condone lawsuits that exceed the scope of EEOC exhaustion, because doing so would thwart the administrative process and peremptorily substitute litigation for conciliation. Nevertheless, competing policies underlie judicial interpretation of the exhaustion requirement. On one hand, the scope of an EEOC charge should be liberally construed for litigation purposes because Title VII "was designed to protect the many who are unlettered and unschooled in the nuances of literary draftsmanship." On the other hand, the "primary purpose of Title VII is to trigger the investigatory and conciliatory procedures of the EEOC, in [an] attempt to achieve non-judicial resolution of employment discrimination claims." To reconcile these policies, this court construes an EEOC complaint broadly but in terms of the administrative EEOC investigation that "can reasonably be expected to grow out of the charge of discrimination." We use a "fact-intensive analysis" of the administrative charge that looks beyond the four corners of the document to its substance. In sum, a Title VII lawsuit may include allegations "like or related to allegation[s] contained in the [EEOC] charge and growing out of such allegations during the pendency of the case before the Commission."

*McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 273 (5th Cir. 2008) (citations omitted).

Unlettered or not, the record shows that Mr. Washington had already corrected an incorrect charge when he appealed a final agency determination based upon a charge

based only upon the telephone calls and failed to investigate his being made to clock out. *See* Charge Letter from Otis Maclin, Jr. to Rodney Washington, Nov. 25, 1997 (rescinding the final agency decision of Aug. 28, 1997, restating the charge, and giving Plaintiff another opportunity to correct any objectionable phrasing of the issues) ("Exh. B-3" in Defendant's original motion to dismiss). The charge reads as follows: "You were harassed by Supervisor Cobb when he had two employees call your home on December 25, 1996, and upon your return to duty on January 8, 1997, you were placed off the clock." *See* Charge Letter from Otis Maclin, Jr. to Rodney Washington, Nov. 25, 1997 ("Exh. B-3" in Defendant's original motion to dismiss). It does not say ". . . and you were refused limited duty" or ". . .and you were denied the right to return to work."

Looking "beyond" the charge and into the agency determination to determine "the actual scope of the EEOC's investigation, which is clearly pertinent to an exhaustion inquiry," *McClain*, 519 F.3d at 274, the closest thing to an acknowledgment of the denials of limited duty or a right to return to work is the following paragraph of the decision:

> Regarding the allegation that you were placed off the clock, I do not find the record establishes a prima facie case of discrimination based on race, in that, you have not been able to identify, nor do the records show, any similarly-situated employees of other races, who were treated more favorably than you.

*See* Decision Letter from Robert E. Walters to Rodney Washington, Dec. 16, 1998, at 3 ("Exh. B-5" in Defendant's original motion to dismiss). There is only discussion of Plaintiff's being placed off the clock as a discriminatory or retaliatory act; no mention is made of the retaliatory or discriminatory nature of Plaintiff's being denied limited duty

or being prohibited from returning to work. We understand that agency determinations sometimes go beyond the charge, and that a finding of exhaustion is appropriate in those circumstances, but that is not the case here. It is simply improper to assume that these allegations could be considered as "growing out of such allegations during the pendency of the case before the Commission." *See McClain*, 519 F.3d at 273. Washington's problem is that nothing "grew out of" his original allegations, and the agency investigation was narrowly focused on the charge as presented to him and based on the facts he alleged. The factual allegations in his original EEO complaint *barely* raised an issue regarding his being made to clock out at all, and were so slight that the initial agency investigation only focused on the telephone calls. Moreover, the investigation had to be undertaken anew to include the claims for being placed off the clock. *See Rodney Washington's EEO Complaint of Discrimination in the Postal Service*, July 25, 1997 ("Exh. B-1" in Defendant's original motion to dismiss). The investigating agency did not, nor is it expected to, inquire anticipatorily into every conceivable issue of discrimination or retaliation that *might* be triggered by being made to clock out so as to accomplish Plaintiff's exhaustion-by-bootstrapping. Because these claims are based on facts not presented before the EEO investigation, they are not properly before us. They should likewise be dismissed and the Defendant's motion to reconsider our earlier ruling will be granted to that extent.

## III.  Defendant's Second Motion for Summary Judgment (Doc. 76) in Cause 07-1192

Defendant filed a second motion for summary judgment on November 10, 2008, which squarely addressed Plaintiff's most recently-filed employment complaint, suit

number 07-1192. In this latest action Mr. Washington raised similar claims of racial discrimination, retaliation, hostile work environment, and disability discrimination under the Americans with Disabilities Act. Plaintiff had notice from the Clerk of Court on November 12, 2008 that he had fifteen calendar days from the date of the notice to file a memorandum in opposition. No such opposition has been filed. As it states prominently within the notice, "OPPOSITION TO THE MOTION MUST BE FILED TIMELY OR THE MOTION WILL BE CONSIDERED UNOPPOSED." (*See Notice of Motion Setting*, Doc. 77.) Accordingly, as it is unopposed Defendant's second motion for summary judgment, which challenges Plaintiff's entire claim, will be GRANTED. Washington's claims in suit number 07-1192 will be therefore dismissed with prejudice.

## IV.    Conclusion

For the reasons set forth in this Ruling—in which Defendant's first motion for summary judgment on and reconsidered motion to dismiss the claims advanced in Plaintiff's suits in causes 02-0752 and 04-1969 will be GRANTED—causes 02-0752 and 04-1969 will be DISMISSED WITH PREJUDICE. Additionally, Defendant's second motion for summary judgment on the claims advanced in Plaintiff's suit numbered 07-1192 will be GRANTED and cause 07-1192 will be DISMISSED WITH PREJUDICE.

SIGNED on this 30th day of December, 2008 at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE